**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)**

| | |
|---|---|
| **SHARON RANDOLPH, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED** | * |
| **12221 Fletchertown Road** | * |
| **Bowie, Maryland 20720** | * |
| **Plaintiffs** | * |
| **v.** | *    **CIVIL ACTION NO.** |
| **WELLS FARGO BANK, N.A.** | * |
| **420 Montgomery Street** | |
| **San Francisco, California 94104** | * |
| **SERVE ON:** | * |
| **CSC LAWYERS INCORPORATING SVCS.** | |
| **7 St. Paul Street, Suite 820** | * |
| **Baltimore, Maryland 21202** | |
| | * |
| **Defendant** | * |

\*     \*     \*     \*     \*     \*     \*     \*     \*

## COMPLAINT

## I. INTRODUCTION

1.    In 2008 the United States Congress set aside $50 billion in stimulus funding for the federal Home Affordable Modification Program (HAMP). Created in the wake of the mortgage crisis, HAMP was designed to keep people in their homes, providing a measure of stability to homeowners facing unemployment or underemployment in harsh economic conditions.

2.    The purpose of HAMP was to encourage lenders to modify mortgage loans and provide homeowners the opportunity to remedy their financial downturn by reducing their immediate monthly payment and applicable interest rate.

3.    Wells Fargo Bank, N.A. ("Wells Fargo") took billions of dollars from the federal government to help homeowners, not force illegal foreclosures upon those unfortunate borrowers.

4.      As part of HAMP, borrowers were to participate in a Trial Payment Period.  During that period, the borrower would make a reduced monthly payment to the Defendant to qualify under HAMP.

5.      Wells Fargo now admits to wrongfully failing to disclose property title lien issues to Plaintiff and the class members which affected their ability to obtain loan modifications.  That issue damaged Plaintiff and the class members, and Wells Fargo has admitted to its own wrongdoing.  Wells Fargo recently sent arbitrary, one-time payments to Plaintiff and class members without explanation or basis, other than to admit it failed to notify Plaintiff and class members of title lien issues affecting their loan modifications. Wells Fargo also admits retaining trial payments in the process. Wells Fargo knew the title issues would result in foreclosures.

6.      The matter before this Court is very specific.  Neither the Plaintiff nor the class members are making any direct claim under HAMP, nor are they asserting any private right of action under HAMP.  The claims are brought directly against Wells Fargo as outlined herein.

**II. PARTIES**

7.      Plaintiff Sharon Randolph is a resident and citizen of Maryland, who owned a home in Maryland during the relevant time period and said property and the loan associated therewith is the subject of this action.

8.      Defendant Wells Fargo Bank, N.A. is incorporated in Delaware, and its principal place of business is 420 Montgomery Street, San Francisco, California 94104.  Wells Fargo conducted substantial business in Maryland as explained herein.

**III. JURISDICTION**

9.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, upon information and belief there are at least hundreds of members in the proposed class, and at least one member of the class of plaintiffs is a citizen of a state different from the Defendant.

10.    This Court has personal jurisdiction over Defendant Wells Fargo Bank, N.A., because it conducts substantial business in this jurisdiction, the property at issue is in this jurisdiction, the financial transactions between the parties occurred in this jurisdiction and the defendant has availed subjected itself of the laws of this jurisdiction.

11.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in, were directed to, and/or emanated from this District.

## IV. THE FEDERAL HAMP PROGRAM

12.    In response to rapidly deteriorating financial market conditions in the late summer and early fall of 2008, Congress enacted the Emergency Economic Stabilization Act. The centerpiece of the Act was the Troubled Asset Relief Program (TARP), which required the Secretary of the Treasury to "implement a plan" to "minimize foreclosures" and keep troubled mortgage-borrowers in their homes.[1]

13.    The Treasury Secretary created the HAMP program to carry out Congress's mandate. HAMP received $50 billion in TARP funds.[2] Mortgage lenders that *chose* to participate in the HAMP program were eligible to receive allocations of these stimulus funds.

14.    Wells Fargo chose to participate in HAMP.

15.    To participate, Wells Fargo was required to comply with all HAMP program requirements. In exchange for up to $6.4 billion in HAMP funds, Wells Fargo agreed to abide by

---

[1] *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556 (7th Cir. 2012).

[2] *Id.*

all guidelines and procedures issued by the Treasury with respect to HAMP and any supplemental documentation issued by the Treasury, including Supplemental Directives.

16.     In a Supplemental Directive, the Treasury Secretary required loan-servicers participating in HAMP to issue a mortgage modification to any borrower who met the criteria to qualify. *See* Supplemental Directive 09–01 (if a borrower meets all qualifying criteria, "the servicer MUST offer the modification") (emphasis in original).

17.     Among other things, to be eligible for HAMP, borrowers needed to:

     a.     Show that they had suffered a financial hardship;

     b.     Be able to pay 31% of their monthly income towards the mortgage.

18.     If the borrower met these eligibility criteria, the loan servicer participating in HAMP was required to issue a mortgage modification if the "Net Present Value" of the modified mortgage was positive, meaning it was "more profitable to modify the loan" than to "allow the loan to go into foreclosure." *See* Supplemental Directive 09–01.

19.     The basic formula for calculating Net Present Value is: Net Present Value = (Expected Revenue from Modified Mortgage) – (Expected Cost of Foreclosing). In essence, a positive Net Present Value meant that the lender was expected to lose money by foreclosing on rather than modifying the mortgage.

20.     If the Net Present Value calculation was positive, the Treasury Secretary required the loan servicer to issue a modification. If it was negative, the servicer could choose to offer a modification, but did not have to. *See* Supplemental Directive 09-01. Loan servicers received HAMP money for every loan modification they issued as an incentive to offer modifications.

21.     When modifying a mortgage, HAMP-participating lenders were required to reduce the borrower's monthly mortgage payment to get it "as close as possible to 31 percent" of the borrower's monthly income.[3] To achieve this, loan servicers were required to reduce the interest

---

[3] Supplemental Directive 09–01.

rate on the loan.[4] If this reduction was insufficient to get the payment down to 31 percent of borrower income, the loan servicer was required to convert the mortgage to a 40-year term. If that wasn't enough, the servicer was required to place the loan in forbearance and waive interest on the loan while in forbearance.

22.     Borrowers were given a "trial payment plan" modification for three months or more. If they were able to pay the modified amount and remained HAMP-eligible, they should receive a permanent modification.

## V. PLAINTIFF'S EXPERIENCE

23.     Plaintiff was the exact type person whom HAMP was supposed to help. Prior to seeking financial assistance in the form of a loan modification from Wells Fargo, she was working full-time as a real estate agent before the market crash in 2008.

24.     From November 2010 to March 2012, Wells Fargo claims to have reviewed Plaintiff's account for "payment assistance options" as she was seeking financial assistance to save her home.

25.     Plaintiff provided all financial information requested by Wells Fargo and entered into the Trial Payment Period and made the trial payments as calculated and directed by Wells Fargo and was told she qualified for a loan modification.

26.     After she made trial payments, Wells Fargo reversed course and informed she was not being granted a loan modification. No further relevant information was communicated to her by Wells Fargo regarding the matter.

27.     Plaintiff's home was then foreclosed in May 2014.

28.     On April 10, 2019, Plaintiff unexpectedly received a $300.00 check from Wells Fargo. Accompanying the check was a letter stating she had originally been told by Wells Fargo she was approved for a loan modification trial plan, but she had been removed from the plan due to title issues. (Ex. A). This is the first time Wells Fargo told Plaintiff that fact. Wells Fargo also

---

[4] *Id.*

admitted they should have told Plaintiff the modification may be denied at that time due to title issues. (Ex. A). Wells Fargo did not originally tell her this information in order to induce her to make trial period payments even though knowing they were not going to modify her mortgage.

29.    On May 31, 2019, Wells Fargo again wrote Plaintiff informing her they had previously removed her account from review due to title liens attached to the property. (Ex. B).

30.    In the May 31, 2019 letter Wells Fargo specifically admitted to Plaintiff:

> **"In this instance we should have let you know at the time of the loan modification trial approval, that the modification might be denied due to title issues, even if you paid the trial period payments"**.

(Ex. B) (emphasis added).

31.    Wells Fargo's letter did not explain how Wells Fargo determined the $300.00 amount offered but stated no additional financial assistance would be forthcoming from Wells Fargo.

32.    Plaintiff brings this action on behalf of herself and others similarly affected by Wells Fargo's failure to inform borrowers of title issues negatively affecting their loan modifications.

## VI. CLASS ALLEGATIONS

33.    This putative class action is brought pursuant to Rule 23(b)(2), 23(b)(3), 23(c)(4) and Rule 23(c)(5) of the Federal Rules of Civil Procedure on behalf of the following classes:

Nationwide Class:

> All persons in the United States of America who Wells Fargo acknowledges that it failed to inform of property title issues that negatively affected their loan modification process.

Maryland Sub-Class:

> All persons in the state of Maryland who Wells Fargo acknowledges that it failed to inform of property title issues that negatively affected their loan modification process.

34.     Excluded from the Class are: Wells Fargo Bank, N.A. and any of its parents, subsidiaries, affiliates, officers and directors, current or former employees, and any entity in which Wells Fargo has a controlling interest. Also excluded are any individuals who make a timely election to opt out of this proceeding using the proper protocol. Also excluded are any federal, state or local governments, including any governmental departments, agencies, divisions, bureaus, boards, sections, groups, counsels, or subdivisions. Lastly, also excluded are any judges assigned to hear any aspect of this litigation, as well as their immediate family members.

35.     Plaintiff reserves the right to modify or amend this Class definition before the Court determines whether certification is appropriate.

## VII. **RULE 23 ELEMENTS**

36.     Numerosity. The Class is so numerous that joinder of all members is impracticable. Upon information and belief, the affected individuals number well into the hundreds or more.

37.     Commonality. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

   a.  Whether Wells Fargo's software programs applicable to the issue in this matter were negligently designed and/or used;

   b.  What caused the error(s) involving title issues admitted to by Wells Fargo;

   c.  What process Wells Fargo used to determine which borrowers were affected by the error(s) involving title issues;

   d.  How Wells Fargo determined how much money to send Class Members as result of their admitted duty to inform Class Members of title issues affecting their loan modifications;

   e.  How Wells Fargo handled and notified Class Members of the title issues impacting their mortgage modification;

   f.  Whether Defendant's conduct was an unlawful or unfair business practice pursuant to the Maryland Consumer Protection Act. *Md. Code Ann., Com. Law* §§ 13-303);

    g.   Whether Defendant's conduct was an unlawful or unfair business practice pursuant to the Maryland Mortgage Fraud Protection Act. *Md. Code Ann.,* §§ 7-401;

    h.   Whether Plaintiff and the Class are entitled to any equitable relief, including, but not limited to, injunctive relief and restitution; and

    i.   Whether Plaintiff and the other Class Members are entitled to actual, statutory, or other forms of damages, and other monetary relief.

38.    <u>Typicality</u>. The named Plaintiff's claims are typical of those of other Class Members because each seeks to recover for injuries caused by the conduct by Wells Fargo and each suffered damages when their HAMP modification application was denied due to title and/or lien issues.

39.    <u>Adequacy</u>. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff's counsel is competent and experienced in litigating class actions.

40.    <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

41.    Damages for any individual Class member are likely insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go unremedied.

42.    Class certification is also appropriate under Fed. R. Civ. P. 23(a) and (b)(2), because Defendant has acted or has refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

**VIII. <u>TOLLING ALLEGATIONS</u>**

43.     Plaintiff and Class Members could not have discovered, through reasonable diligence, that Wells Fargo's admitted duty to inform them that title issues caused a denial of their loan modifications prior to Wells Fargo admitting said duty.

44.     The evidence and means of discovering Wells Fargo's duty were within Wells Fargo's exclusive control. As a result, any applicable statutes of limitation are tolled.

45.     In addition, any applicable statutes of limitation have been tolled by Wells Fargo's knowing, active failure to inform Plaintiff and the Class Members of the facts alleged herein. Wells Fargo kept Plaintiff and all Class Members ignorant of vital information essential to the pursuit of their loan modifications, without any fault or lack of diligence on the part of Plaintiff and the Class Members.

46.     Wells Fargo admits it owed a duty to inform Plaintiff and Class Members but yet continued denying loan modifications while title issues existed for Plaintiff and Class Members. Upon information and belief, Wells Fargo did not inform Plaintiff or Class Members about the errors until 2019.

47.     Further, by admitting its error(s) and paying the Plaintiff and the Class in 2019, the status of limitations was re-started based on the admission and offer of payment.

48.     Wells Fargo was under a continuous duty to disclose this information to Plaintiff and Class Members and has admitted this duty.

49.     Plaintiff and Class Members reasonably relied on Wells Fargo.

50.     As a result, Wells Fargo is precluded by estoppel from relying on a statute of limitations defense.

## IX. RICO FACTUAL ALLEGATIONS

51.     As alleged below, Plaintiff brings claims pursuant to 18 U.S.C. §§ 1962(c) and 1964 of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The following allegations pertain to each claim for relief under RICO.

52.     Plaintiff and the members of the Class are each "persons" as that term is defined in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of Defendant's wrongful conduct.

53.     Defendant is, and at all relevant times was, a "person" within the meaning of 18 U.S.C. § 1961(3) because it is an entity capable of holding legal or beneficial interest in property. Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore . . . and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

54.     Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. §1962(c).

55.     RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."18 U.S.C. § 1961(4). An association-in-fact enterprise generally has three structural features, including: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose. See *Boyle v. United States*, 556 U.S. 938, 946 (2009).

56.     America's Servicing Company ("ASC") is a related company to Wells Fargo that provides loan servicing activities. ASC was directly involved in the servicing of Plaintiff's loan, including during the trial payment period beginning at least in 2011, and upon information and belief, was similarly involved in the other class members' loan servicing.

57.     As alleged below and throughout this Complaint, Wells Fargo and ASC each orchestrated a scheme to deny loan modifications to Plaintiff and members of the Class by failing to inform of title issues thereby causing a denial of loan modifications even if Plaintiff and members of the Class paid their trial period payments. Wells Fargo and ASC conducted their

business through association-in-fact enterprises in violation of section 1962(c) by a pattern of racketeering activity, including mail and wire fraud, for the purpose of improperly profiting from unlawfully denying loan modifications with title issues. The scheme enabled Wells Fargo and ASC to enjoy the benefit of the trial payments, fees and costs while denying loan modifications.

58.    Defendant's endeavor had the desired effect. Wells Fargo and ASC secured unlawful profits during the pendency of the enterprise. And, as collateral damage, unsuspecting borrowers were charged fees and costs, and in some cases, foreclosures, as a result of Defendants' conduct.

**COUNT I**
**VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT, 18 U.S.C. § 1962(C)**
**(On Behalf of the Nationwide Class and Maryland Sub-Class)**

59.    Plaintiff incorporates by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

61.    Plaintiff brings this claim for relief on behalf of herself and the members of the Nationwide Class pursuant to 18 U.S.C. §§ 1962(c) and 1964 of RICO against Wells Fargo and ASC.

**A.    The "Wells Fargo and ASC Enterprise"**

62.    Defendant Wells Fargo and ASC formed an association-in-fact enterprise, referred to as the "Wells Fargo and ASC Enterprise." The Wells Fargo and ASC Enterprise included: (a) Wells Fargo, its subsidiaries, employees, and agents; and (b), its subsidiaries, employees, and agents. The Wells Fargo and ASC Enterprise was formed for the purpose of unlawfully extracting significant revenue and profits from Plaintiff and the Class by wrongfully not disclosing known title issues in the context of Plaintiff and the Class seeking loan modifications. At all relevant times, each member of the Wells Fargo and ASC Enterprise was aware of the enterprise's purpose and conduct, and was a knowing, willing, and active participant in that conduct. Each member of the enterprise reaped substantial profits from the conduct of the enterprise.

63.     Each member of the Wells Fargo and ASC Enterprise acquired, maintained control of, was associated with, and conducted or participated in the conduct of the enterprise's affairs. But, at all relevant times, the enterprise, and each member thereof: (a) had an existence separate and distinct from each of its members; (b) was separate and distinct from the pattern of racketeering in which they engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the Defendant, along with other individuals and entities, including unknown third parties.

64.     The members of the Wells Fargo and ASC Enterprise are systematically linked through continually coordinated activities, financial ties, and contractual business arrangements. Plaintiffs are informed and believe the Wells Fargo and ASC Enterprise is an ongoing and continuing enterprise.

65.     Neither Wells Fargo nor ASC could have accomplished the purpose of the Wells Fargo and Enterprise without the assistance of the other and both profited financially from the scheme.

66.     The Wells Fargo and ASC Enterprise described above involved regular communications between Wells Fargo and ASC in which customer information was exchanged to facilitate the goals of the enterprise. Such communication occurred, and continues to occur, through the mail and wire facilities of the United States. The members of the Wells Fargo and ASC Enterprise functioned as a continuing unit for the purposes of implementing the scheme, and each agreed to take actions to hide the existence of the scheme, as well as the controlling association-in-fact enterprise from others.

67.     The Wells Fargo and ASC Enterprise engaged in and affected interstate commerce because, inter alia, it advertised, issued, and affected the loan modifications of thousands of Class members throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico, and the Wells Fargo and ASC Enterprise deprived Plaintiff and Class members of loan modifications many times resulting in foreclosure of their homes in interstate commerce with Wells Fargo.

68.     The effects of the Wells Fargo and ASC Enterprise are still felt today, as many Wells Fargo customers have lost payments, lost their homes and have suffered negative credit reporting.

**B.     Conduct of the "Wells Fargo and ASC Enterprise"**

69.     During the Class Period, Wells Fargo exerted control over the Wells Fargo and ASC Enterprise and participated in the operation and management of its affairs, directly and indirectly in the following ways:

     a.     Misrepresenting the terms of the loan modifications to customers upon their application and throughout the application process;

     b.     Transmitting loan application and other customer information;

     c.     Misrepresenting the circumstances of title issues for the subject properties and for which customers sought loan modifications;

     d.     Denying loan modifications knowing of these title issues;

     e.     Receiving compensation and fees from Plaintiff and the Class members;

     f.     Concealing the true nature of its relationship; and

     g.     Collecting trial payments from Plaintiff and Class members.

70.     The Wells Fargo and ASC Enterprise has a hierarchical decision-making structure headed by Wells Fargo. Wells Fargo generally directed the loan modification process and decided to not disclose title issues to Plaintiff and Class members. Wells Fargo generally directed review of loan modifications and the servicing of loans.  ASC participated in and conducted the affairs of the Wells Fargo Enterprise, in the following ways:

     a.     Approving or denying loan modifications in the enterprise's fraudulent scheme;

     b.     Misrepresenting that it did or would grant a loan modification to Plaintiff and Class members;

     c.     Ignoring and/or disregarding title issues affecting loan modifications;

     e.     Accepting trial payments from Plaintiff and Class members;

f.   Accepting payment for servicing the loan modifications;

g.   Transmitting information about loan modifications and/or title issues regarding Wells Fargo customers;

h.   Misrepresenting its role in the loan modification application process; and

j.   Concealing the true nature of its relationship with Wells Fargo.

71.   Wells Fargo also directed and controlled the ongoing organization necessary to implement the common purpose of the enterprise and meetings and communicated with Plaintiff and the Class.  Defendant and other third parties currently possess such documents.

**C.   Pattern of Racketeering Activity**

72.   Defendant and ASC carried out their scheme through a pattern of racketeering activity that employed the use of United States mail and wire facilities.

73.   Defendant and ASC accomplished this scheme by committing, conspiring to commit, and/or aiding-and-abetting the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years.

74.   Defendant and ASC predicate acts of racketeering activity (18 U.S.C. § 1961(1)(B)) including, but are not limited to:

•   <u>Mail Fraud</u>:   Defendant and violated 18 U.S.C. § 1341 by sending and/or receiving, or causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers, for the purpose of executing the unlawful and fraudulent scheme to profit from their actions.

•   <u>Wire Fraud</u>:   Defendant and violated 18 U.S.C. §1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful and fraudulent scheme to profit from their actions.

75.   The Wells Fargo and ASC Enterprise's pattern of racketeering likely involved thousands of separate instances wherein the U.S. Mail or interstate wire facilities were knowingly and intentionally used to further the enterprise's pattern of racketeering activity, including mail and wire fraud. Many of the precise dates of the fraudulent use of the U.S. Mail and interstate wire

facilities have been deliberately hidden and cannot be alleged without access to Defendant's books and records.

76.     Plaintiff has, however, described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the Wells Fargo and ASC Enterprise's scheme, including the things and documents described below. Wells Fargo and ASC's use of the mail and wire includes, but is not limited to:

   a.     Marketing materials regarding Defendant's loan modifications;

   b.     Correspondence between Wells Fargo and ASC establishing their relationship regarding the enterprise, and the issuance of related loan modification documents;

   c.     Loan documents exchanged between (1) Wells Fargo and ASC and borrowers; and (2) Wells Fargo and ASC;

   d.     Loan payment notices exchanged between Wells Fargo and ASC and borrowers;

   e.     Loan balance statements exchanged between Wells Fargo and ASC and borrowers;

   f.     Loan payments sent by borrowers to Wells Fargo and ASC; and

   g.     Demands for trial payments sent by Wells Fargo and ASC to borrowers.

77.     The Wells Fargo and ASC Enterprise also communicated by U.S. Mail, interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, and other third-party entities in furtherance of the Wells Fargo and ASC Enterprise's mail and wire fraud. Wells Fargo and ASC knew, and intended that, Plaintiff and the members of the Class would rely on the material misrepresentations and omissions made by them and would incur unwarranted costs and in many cases foreclosure as a result. Indeed, Plaintiff and the Class did follow the loan modification directions of Wells Fargo and ASC.

78.     Each   of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these

violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Wells Fargo and ASC intended to and did defraud Plaintiff and members of the Class.

79.     Each instance of racketeering activity alleged herein was related to, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and the Class.

80.     The pattern of racketeering activity alleged herein, and the Wells Fargo and ASC Enterprise are separate and distinct from each other. Likewise, Wells Fargo and ASC are distinct from the Wells Fargo and ASC Enterprise. Wells Fargo and ASC have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

81.     Defendant's racketeering activity occurred within five years of the commission of a prior incident of racketeering.

**D.     Damages**

82.     Defendant's pattern of racketeering activity directly and proximately caused Plaintiff and members of the Class injury in their business and property because Plaintiff and members of the Class paid trial payments that were unnecessary, and only to the benefit of Wells Fargo and ASC. The result for Plaintiff and members of the Class is excessive payments, costs and fees charged by Wells Fargo and ASC, as well as diminished credit scores, loss of homes and costs of foreclosure.

83.     Plaintiff and the Class members are the most directly harmed individuals and entities and there are no other Plaintiffs better suited to seek a remedy from the Wells Fargo and ASC Enterprise for the economic harms at issue here.

84.     Plaintiff also seeks all legal relief as allowed by law, including *inter alia*, actual damages and treble damages. Plaintiff seeks equitable relief, including but not limited to the elimination of adverse notations on their credit reports and remediating reduced credit scores, as

deemed proper by the Court. Plaintiff also seeks attorneys' fees, all costs and expenses of suit, and pre- and post-judgment interest pursuant to 18 U.S.C. § 1964(c).

## COUNT II
## NEGLIGENCE
### (On Behalf of the Nationwide Class and Maryland Sub-Class)

85.    Plaintiff incorporates all allegations as if fully set forth herein.

86.    Wells Fargo admits in writing to owing a duty to Plaintiff and Class Members to inform of any title issues affecting the ability to obtain loan modifications.

87.    Wells Fargo admits to having a duty to exercise reasonable care in the creation, implementation, and use of its programs and representatives to determine whether title issues existed affecting the ability to obtain loan modifications.

88.    Wells Fargo had a duty to ensure that borrowers were made aware that the title issues would prevent Plaintiff and Class Members from obtaining loan modifications.

89.    Nevertheless, Wells Fargo failed to accurately and timely inform Plaintiff and Class Members of the existence of title issues that caused loan modification denials.

90.    Wells Fargo breached its duties to Plaintiff and Class Members by:

a.    Failing to perform mortgage servicing functions consistent with its responsibilities to Plaintiff and Class Members;

b.    Creating, implementing, and using programs and protocols that were flawed and defective and thereby failed to or incorrectly notified Plaintiff and Class Members of title issues;

c.    Failing to properly supervise its agents and employees who developed, implemented, and used the programs to determine whether a borrower qualified for loan modifications in instances where title issues were known to exist or it should have known existed;

d.    Failing to give Plaintiff and Class Members the opportunity to discover or be informed of title issues and correct those issues; and

e.    Concealing the effect of title issues on loan modifications.

91.     Wells Fargo knew (and has now admitted) or should have known that borrowers such as Plaintiff and Class Members would suffer injury as a result of Wells Fargo's failure to exercise reasonable care.

92.     Wells Fargo's violations of law and/or negligence were the direct and proximate cause of Plaintiff and Class Members' injuries, harm and economic loss, which Plaintiff and Class Members suffered and will continue to suffer.

93.     As a consequence of Wells Fargo's negligence, Plaintiff and Class Members were injured in at least the following ways:

      a.     wrongful foreclosures;

      b.     otherwise avoidable losses of homes to foreclosure;

      c.     payment of trial period payments that were unnecessary and are unaccounted for;

      d.     increased fees and other costs to avoid or attempt to avoid foreclosure;

      e.     lost equity in homes that were foreclosed upon;

      f.     loss of savings in fruitless attempts to secure mortgage modifications;

      g.     loss of opportunities to pursue other refinancing or loss mitigation strategies;

      h.     increased costs associated with lowered credit scores; and

      i.     significant stress causing physical injuries and emotional distress.

**COUNT III**
**MARYLAND CONSUMER PROTECTION ACT**
**(On Behalf of Maryland Sub-Class)**

94.     Plaintiff incorporates by reference the above allegations as if fully set forth herein.

95.     Wells Fargo has engaged in unfair or deceptive trade practices in the "sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services, or in the extension of consumer credit." *See* Md. Code Ann., Com. Law § 13-303 ("MCPA").

96.     The MCPA states "consumer credit", "consumer debts", "consumer goods", "consumer realty", and "consumer services" mean, respectively, credit, debts or obligations, goods, real property, and services which are primarily for personal, household, family, or agricultural purposes. Md. Code Ann., Com. Law § 13-101(d)(1).

97.     The MCPA specifically applies to unfair or deceptive trade practices undertaken in connection with services performed by mortgage servicers pursuant to a deed of trust. *See, e.g.*, *Allen v. CitiMortgage, Inc.*, 2011 WL 3425665, at *10 (D. Md. Aug. 4, 2011).  Md. Code Com. Law § 13-316 imposes specific requirements on mortgage servicers.

98.     Wells Fargo's violations of the MCPA have resulted in a: (1) substantial injury; (2) that is not outweighed by any countervailing benefits to the consumer or to competition that the practice produces; and (3) is not be the type of injury that a consumer could reasonably have avoided.

99.     The harm suffered by the Plaintiff and Class Members is not trivial or merely speculative. Plaintiff and the Class Members have been wrongfully denied loan modifications and/or foreclosure of their homes because Wells Fargo admittedly failed to meet its required duty to inform of title issues that would cause at a minimum a denial of the loan modifications and/or ultimately foreclosure of their homes.

100.    The injuries resulted from an occurrence of the nature that the MCPA was designed to prevent.

101.    Wells Fargo's acts and failure to act were the direct and proximate cause of Plaintiff's and the Class Members' injuries.

102.    Plaintiff and Class Members are members of the class of persons for whose protections said laws and regulations were adopted.

## COUNT IV
## MARYLAND MORTGAGE FRAUD PROTECTION ACT
### (On Behalf of Maryland Sub-Class)

103.    Plaintiff incorporates by reference the above allegations as if fully set forth herein.

104.    The Maryland Mortgage Fraud Protection Act ("MMFPA") prohibits mortgage fraud during the mortgage lending process. *Md. Code Annotated*, § 7–401(d). The "mortgage lending process" includes servicing the loan. *Id.* § 7–401(e)(2).

105.    Wells Fargo's violations of the MMFPA have resulted in a: (1) substantial injury; (2) that is not outweighed by any countervailing benefits to the consumer or to competition that the practice produces; and (3) is not be the type of injury that a consumer could reasonably have avoided.

106.    The harm suffered by the Plaintiff and Class Members is not trivial or merely speculative. Wells Fargo admittedly failed to meet its required duty to inform Plaintiff and the Class Members of known title issues that existed at the time and caused, at a minimum, a denial of the loan modifications and/or ultimately foreclosure of their homes. Plaintiff and the Class Members paid trial payments that they would not have paid had they known these title issues would result in being denied loan modifications and/or foreclosure of their homes.

107.    The injuries resulted from an occurrence of the nature that the MMFPA was designed to prevent.

108.    Wells Fargo fraudulently concealed the facts alleged herein from Plaintiff and the Class. Wells Fargo: (1) owed a duty to Plaintiff to disclose material facts; (2) failed to disclose said facts; (3) intended to defraud or deceive Plaintiff; (4) Plaintiff took action in justifiable reliance on the concealment; and (5) Plaintiff suffered damages as a result of Wells Fargo's concealment.

109.    Wells Fargo's acts and failure to act were the direct and proximate cause of Plaintiff's and the Class Members' injuries.

110.    Plaintiff and Class Members are members of the class of persons for whose protections said laws and regulations were adopted.

## COUNT V
## NEGLIGENCE PER SE
### (On Behalf of Nationwide Class and Maryland Sub-Class)

111.    Plaintiff incorporates by reference the above allegations as if fully set forth herein.

112.     Wells Fargo violated the Maryland Consumer Protection Act and the Maryland Mortgage Fraud Protection Act, as fully discussed above.

113.     Wells Fargo's violation of the MCPA and MMFPA directly and proximately caused Plaintiff's and Class Members' injuries, including but not limited to:

     a.     wrongful foreclosures;

     b.     otherwise avoidable losses of homes to foreclosure;

     c.     payment of trial period payments that were unnecessary and are unaccounted for;

     d.     increased fees and other costs to avoid or attempt to avoid foreclosure;

     e.     lost equity in homes that were foreclosed upon;

     f.     loss of savings in fruitless attempts to secure mortgage modifications;

     g.     loss of opportunities to pursue other refinancing or loss mitigation strategies;

     h.     increased costs associated with lowered credit scores; and

     i.     significant stress and emotional distress.

114.     The injuries resulted from an occurrence of the nature that the MCPA and MMFPA were designed to prevent.

115.     Plaintiff and Class Members are members of the class of persons for whose protections the laws and regulations were adopted.

## COUNT VI
## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, on behalf of herself and all Class Members, requests judgment be entered against Defendant and the Court grant the following:

     A.     An order determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

     B.     That Plaintiff is a proper class representative;

C.      That Plaintiff's attorneys be appointed class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

D.      That class notice be promptly issued;

E.      For judgment against Defendant for Plaintiff's and Class Members' asserted causes of action;

F.      Appropriate declaratory relief against Defendant;

G.      Preliminary and permanent injunctive relief against Defendant;

H.      An award of all applicable damages;

I.      An award of reasonable attorneys' fees and other litigation costs reasonably incurred; and

J.      Any and all other relief to which Plaintiff and the Classes may be entitled.

## COUNT VII
## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury for all issues so triable.

_____

Bruce M. Plaxen          Federal Bar #05378
**Plaxen & Adler, P.A.**
10211 Wincopin Circle Suite 620
Columbia, MD 21044
410-730-7737
FAX 410-730-1615
bplaxen@plaxenadler.com


Richard M. Golomb (*pro hac vice*)
Kenneth J. Grunfeld (*pro hac vice*)
**Golomb & Honik, P.C.**
1835 Market Street, Suite 2900
Philadelphia, PA 19103
Phone: (215) 985-9177
Fax:    (215) 985-4169
Email: rgolomb@golombhonik.com
         kgrunfeld@golombhonik.com
(pro hac application will be sought)

Joseph "Jay" H. Aughtman (*pro hac vice*)
**Aughtman Law Firm, LLC**
1722 Platt Place
Montgomery, AL 36117
Phone: (334) 215-9873
Fax:    (334) 213-5663
Email: jay@aughtmanlaw.com
(*pro hac* application will be sought)

Aaron C. Hemmings (*pro hac vice*)
**Hemmings & Stevens, P.L.L.C**
5540 McNeely Drive, Suite 202
Raleigh, NC 27612
Phone: (919) 277-0161
Fax:    (919) 277-0162
Email: ahemmings@hemmingsandstevens.com
(*pro hac* application will be sought)

*Attorneys for Plaintiff and Classes*

Dated:  November 4, 2019